UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BETHANY MARELL,<br><br>Plaintiff,<br><br>v.<br><br>OFFICER JOE PITTAK,<br>BRYCE BALTING,<br>OFFICER MAKAYLA ELDRIDGE,<br>OFFICER ELLIS HALL,<br>OFFICER PAIGE PARSONS,<br>HUNTER HOUNSHELL,<br>DESTINY SNYDER,<br><br>Defendants. | ) | No. 1:24-cv-00031-JRS-MKK |

**Order Vacating Previous Order, Denying Defendants' Motions for Judgment as a Matter of Law, and Denying Plaintiff's Motion for a New Trial on the Issue of Damages**

On July 8, 2023, Denim Fassold was arrested and booked into Shelby County Jail ("the Jail"). During his stay, he repeatedly complained to correctional officers and medical staff employed by Quality Correctional Care, Inc. ("QCC") about having seizures and needing to go to the hospital due to his epilepsy. Two days later, correctional officers found him unconscious in his cell and transported him to the emergency room, where he was later declared deceased. Plaintiff Bethany Marell, acting as special administrator for Mr. Fassold's estate (hereinafter "the Estate of Fassold" or "the Estate"), brought federal civil rights claims under 42 U.S.C. § 1983

against the Defendants[1] for violating Mr. Fassold's Fourth Amendment right to adequate medical care while he was detained at the Jail. A five-day trial was held, and the jury found Custodial Defendants Makayla Eldridge and Paige Parsons and Medical Defendant Destiny Snyder liable to the Estate. The Custodial Defendants and the Medical Defendants now seek judgment as a matter of law in their favor pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. In addition, the Estate of Fassold moves for a new trial on the issue of damages under Rule 59(a)(1)(A) as well as for attorney fees pursuant to 42 U.S.C. § 1988(b).

The Court previously denied the Custodial Defendants' motion for judgment as a matter of law without prejudice because the Custodial Defendants relied extensively on an unauthorized trial transcript to support their arguments. Dkt. 274. The Court ordered the Custodial Defendants to arrange for a certified transcript within 14 days if they intended to renew their motion. The Custodial Defendants did so and filed a renewed motion for judgment as a matter of law on April 21, 2026. Dkt. 295. As the Estate of Fassold points out in response to this motion, the Court erred when it ordered the Custodial Defendants to file a new Rule 50(b) motion because Rule 6(b) of the Federal Rules of Civil Procedure prohibits district courts from extending "the time to act under Rule[] 50(b)[.]" Fed. R. Civ. P. 6(b)(2). *See Blue v. Int'l Broth. Of Elec. Workers Local Union 159*, 676 F.3d 579, 582 (7th Cir. 2012)

[1] The Estate sued two groups of Defendants. The "Custodial Defendants" were the individual correctional officers working at the Jail. The "Medical Defendants" were the medical providers for the Jail, who were employed by Quality Correctional Care, Inc.

(district courts lack discretion to modify deadlines for the motions enumerated in Rule 6(b)(2)).

Accordingly, the Court **VACATES** its Order denying the Custodial Defendants' motion for judgment as a matter of law without prejudice, dkt. [274]. The Court will review the Custodial Defendants' first motion for judgment as a matter of law, dkt. 250, which was timely filed.

For the reasons explained below, the Custodial Defendants' first motion for judgment as a matter of law, dkt. [250], and the Medical Defendants' motion for judgment as a matter of law, dkt. [252], are **DENIED**. The Estate of Fassold's motion for a new trial, dkt. [254], is **DENIED**. The Estate of Fassold's motion for attorney fees, dkt. [246], is **GRANTED IN PART**.

## I. The Jury Verdict and Special Juror Interrogatories

After a five-day trial on the merits on the Estate's Fourth Amendment claim, the jury found for the Estate and against Officer Paige Parsons ("Ofc. Parsons") in the amount of $75,000. The jury found for the Estate and against Officer Makayla Eldridge ("Ofc. Eldridge") in the amount of $75,000. The jury found for the Estate and against Destiny Snyder ("Ms. Snyder") in the amount of $75,000. The jury found for Officers Joe Pittak, Bryce Balting, Ellis Hall, and Hunter Hounshell.

In addition, the jurors completed special juror interrogatories as to the Custodial Defendants to resolve their affirmative defense that they were entitled to qualified immunity. For each Custodial Defendant, the interrogatory asked, "Did Defendant [] fail to take reasonable action to provide medical care to Denim Fassold?"

Dkt. 241-1. If the juror answered "yes," then the interrogatory asked them to answer the second question, which asked, "How did Defendant [] fail to take reasonable action to provide medical care to Denim Fassold." *Id.*

The jurors answered "yes" for Ofc. Eldridge and Ofc. Parsons. *Id.* at 1–4. For Ofc. Eldridge the jurors wrote that she failed to take reasonable action to provide medical care by:

- "Per exhibit #39, she missed multiple visual checks during her shift. (exhibit #232/scso_000286)
- "She did not present the 'refusal of treatment medical release form' to Denim, nor did she explain #2 on the form. Even without explanation, she selected he was made aware of a 'possible delay in medical treatment . . . " (exhibit #4) (ellipses in original)

*Id.* at 2. For Ofc. Parsons, the jurors wrote:

- "She did not witness Makayla Eldridge presenting the 'refusal of treatment medical release form' to Denim but signed as a witness. (exhibit #4)
- Inaccurate 'incident report' (exhibits #2 and 3)
- She did not document refusal of medical transport to ER. (exhibit #36-33)
- She did not do a follow-up call to QCC on-call after Denim's refusal to go to the ER."

*Id.* at 4.

## II. Factual Background Developed at Trial

The Court states the facts in the light most favorable to the jury's verdict. *See Martin v. Milwaukee Cnty.*, 904 F.3d 544, 547 n.1 (7th Cir. 2018).

**A. Background**

Mr. Fassold was booked into the Jail around 3:00 pm on July 8, 2023. During his intake, Mr. Fassold disclosed that he had a history of seizures and took several medications. Dkt. 281 at 5:12-14 (Tr. Trans. Ofc. Pittak Testimony); Tr. Exh. 50 (Medical Intake Form). The intake officer, Ofc. Pittak, moved Mr. Fassold from a regular cell in the "book-in" area of the Jail to a padded medical observation cell, where an officer would check on him every hour. Dkt. 281 at 6:1–7:4, 19:5–20:7. Video and audio evidence revealed that Mr. Fassold repeatedly complained about vomiting blood and having seizures. Video footage also showed that Mr. Fassold had several seizures in his cell throughout his stay at the Jail. Expert witnesses Dr. Mbeo and Dr. Davis both testified that they identified seizures at various times, including on July 9 at around 4:44 am. Dkt. 280 at 7:16–8:2, 11:6–12:18 (Tr. Trans. Dr. Mbeo testimony); Tr. Exh. 572 (Dr. Davis Testimony).

As will be discussed in more detail below, Ofc. Parsons called the on-call medical provider in the early morning on July 9 after Mr. Fassold told her that he was vomiting blood and having seizures. The medical provider, Jen Winings, ordered Ofc. Parsons to take Mr. Fassold to the hospital. Ofc. Parsons attempted to take Mr. Fassold to the hospital on July 9 at around 4:50 a.m., but determined that he was refusing to go. At around 2:47 p.m. on July 9, the medically trained professional assigned to the Jail, Ms. Snyder, provided a medical assessment of Mr. Fassold. She

contacted the same medical provider, who prescribed 25 mg of Lamictal and Tylenol. Both Dr. Mbeo and Dr. Davis testified that the prescribed dose would not have sufficed to improve Mr. Fassold's condition. Dkt. 280 at 32:24–33:2; dkt. 572. At around 5:00 a.m. on July 10, Ofc. Eldridge, who had been tasked with performing hourly checks on Mr. Fassold, attempted to give Mr. Fassold medication. When he did not respond, she determined that he was refusing the medications and moved on with her day.

Around 7:10 a.m. on July 10, correctional officers found Mr. Fassold unresponsive after trying to give him his breakfast tray. After attempting to revive him, they transferred him to the emergency room. At the hospital, multiple life-saving measures were performed, but Mr. Fassold ultimately passed away from anoxic brain injury due to seizure disorder and hypertensive cardiovascular disease. Dkt. 280 at 19:23–20:20; Tr. Exh. 208 (Autopsy report). Dr. Mbeo testified that if Mr. Fassold had been taken to the emergency room sooner, he would have received IV medication and other interventions that could have prevented his death. *Id.* at 20:11-20.

**B. Ofc. Parsons**

Ofc. Parsons worked a twelve-hour shift in the Jail's book-in area from 8:00 p.m. on July 8th until 8:00 a.m. on July 9th. Dkt. 282 at 7:20-23 (Tr. Trans. Ofc. Parsons Testimony). When Ofc. Parsons arrived, Ofc. Pittak had already put Mr. Fassold in a padded observation cell, where he had to be checked hourly. *Id.* at 9:12-25. At some point, Ofc. Pittak informed Ofc. Parsons that Mr. Fassold was in the

padded medical observation cell because he had a history of seizures and epilepsy. *Id.* Ofc. Parsons was responsible for checking Mr. Fassold's cell every hour, but she did not perform around 5 out of 12 checks. *Id.* at 9:21–13:21.

Throughout the night of July 8 and into the early morning of July 9, Ofc. Parsons communicated with Mr. Fassold and gave him water when he requested. *Id.* at 14:24–15:4. Mr. Fassold told Ofc. Parsons that he was vomiting blood and having seizures. *Id.* at 16:23-25. Ofc. Parsons had also listened to Mr. Fassold's communication box audio around 4:12 a.m. where he complained that he was vomiting blood and having a seizure. *Id.* at 64:16-23.

Around 4:20 a.m. on July 9, Ofc. Parsons called the on-call medical provider, Jennifer Winings. *Id.* at 17:7–19:2; Tr. Exh. 504 (audio of phone call with Ms. Winings). Ofc. Parsons testified that the medical provider is available twenty-four hours a day and that there are no restrictions on how many times she was allowed to contact her. *Id.* at 17:7–19:2. She also testified that she believed that Mr. Fassold was telling the truth about having seizures and vomiting blood and that she saw red droplets that may have been blood on the floor of his cell. *Id.* at 19:3-13.[2] She also knew that Mr. Fassold had a medical diagnosis of epilepsy, which would cause seizures. *Id.* at 22:3-10. During that call, Ms. Winings told Ofc. Parsons to take Mr. Fassold to the hospital if he was vomiting blood. *Id.* at 21:24-25; 65:22-25.

After receiving the order from Ms. Winings, Ofc. Parsons and Ofc. Hall spent approximately six minutes in Mr. Fassold's cell trying to convince him to go to the

[2] Counsel for the Estate of Fassold pointed out that Ofc. Parsons testified in her deposition that she saw blood on the floor and on the side of Mr. Fassold's lip. Dkt. 282 at 20:4–22:2.

hospital. *Id.* at 72:7-15; Tr. Exh 506 (video clip). Ofc. Parsons noticed that Mr. Fassold was just lying down and verbally unresponsive and when she tried to get him up; it seemed to her like he did not want to go to the hospital. Dkt. 282 at 69:8-16. Ofc. Parsons concluded that Mr. Fassold was refusing to go the hospital and stopped trying to get him to go. *Id.* at 72:16–73:16.

After returning to her duties, Ofc. Parsons did not access the video feed of his cell to review whether Mr. Fassold had a seizure before she and Ofc. Hall attempted to take him to the hospital. *Id.* at 23:14-18. Ofc. Parsons also did not fill out a medical refusal form, which is available to all employees in the book-in area. Dkt. 40:25–41:18.

Around 6:00 a.m., Mr. Fassold asked Ofc. Parsons to go to the hospital again. *Id.* at 25:14-17. Ofc. Parsons told Mr. Fassold that she had already tried to take him and that he would have to wait for dayshift. *Id.* at 25:18-23. Ofc. Parsons testified that she did not think that the doctor's order had expired. *Id.* at 25:24–26:2. Instead, she thought that Mr. Fassold did not need to go because he was up and talking to her. *Id.* at 25:18–26:7.

At around 8:00 a.m., Ofc. Parsons reviewed video footage of Mr. Fassold in his cell, which showed him writhing and thrashing around his cell at 4:46 a.m. *Id.* at 23:19–24:7; 53:10–56:1. She showed the video to officers and stated that she thought that Mr. Fassold was faking it. *Id.* at 23:22-5. Before leaving her shift on July 9, Ofc. Parsons relayed information about Mr. Fassold to Ms. Snyder about the night before,

stating that he had been ordered to go to the hospital, but he refused. *Id.* at 77:12–78: 15.

Ofc. Parsons also worked in Master Control on July 10, from 4:00 a.m. to 8:00 a.m. Dkt. 282 at 7:24–8:6. She did not interact with Mr. Fassold during her July 10 shift, but she did observe him at around 4:45 a.m. when she pulled up his communications box and he was talking to another inmate for roughly twenty minutes. *Id.* at 79:12–80:3, 84:24–85:4. During this conversation, the other inmate stated, "[h]e just had a seizure. Come check him out." *Id.* at 92:14–93:2.

On July 10, after Ofc. Eldridge failed to give Mr. Fassold the medication that Ms. Winings prescribed, Ofc. Parsons signed as a witness to the refusal reform. *Id.* at 43:1-5. She saw on camera that Ofc. Eldridge offered the medication, and that Mr. Fassold did not get up. *Id.* at 43:8-15. She did not see Ofc. Eldridge explain that refusal could lead to delay in medical treatment or death even though Ofc. Eldridge marked that this had been explained to Mr. Fassold on the form. *Id.* at 44:5-21; Tr. Exh. 4 (Refusal Form). According to the Jail's policy, of which Ofc. Parsons was aware, inmates are supposed to fill out and sign medication refusal forms. Dkt. 282 at 47:24–48:6; Tr. Exh. 36.

On July 10, Ofc. Parsons also created two incident reports detailing her interactions with Mr. Fassold. Dkt. 282 at 31:15–33:23. Tr. Exhs. 2, 3. The first report explained that Ofc. Parsons attempted to take Mr. Fassold to the hospital in the early hours of July 9, but he kept refusing and did not want to put on his clothes. Dkt. 282 at 36:3-18; Tr. Exh. 3. The second incident report, which was actually submitted,

claimed that "Fassold then stated to Officer Hall and I that he did not want to go to the hospital and that he was refusing treatment." Dkt. 282 at 37:5–38:7; Tr. Exh. 2. During trial, Ofc. Parsons acknowledged that it was not true that Mr. Fassold told her he did not want to go to the hospital. Dkt. 282 at 38:6-7.

**C. Ms. Snyder**

Ms. Snyder worked as a medically trained professional ("MTP") for Quality Correctional Care ("QCC") during the events in the lawsuit. Tr. Trans. Dkt. 289 at 4:18-21. Ms. Snyder worked at the Jail on July 8, but did not interact with Mr. Fassold and none of the officers contacted her about him. *Id.* at 5:7-13. When Ms. Snyder arrived at the Jail for her shift on July 9 at 8:00 a.m., Ofc. Parsons told her about Mr. Fassold's medical issues. *Id.* at 5:14-20. Ofc. Parsons notified Ms. Snyder that the on-call provider ordered her to take Mr. Fassold to the hospital, but that he had refused. *Id.* at 5:21–6:2. Ofc. Parsons told Ms. Snyder that Mr. Fassold had signed a refusal form, but nobody knew where it was. *Id.* at 6:1-4. Upon arriving, Ms. Snyder also retrieved Mr. Fassold's medical intake form, which indicated that he had a history of seizures and was taking 12 medications. *Id.* at 20:9–23:4; Tr. Exh. 50.

Around 2:47 p.m., a correctional officer took Mr. Fassold out of his cell so that Ms. Snyder could conduct a medical assessment. Tr. Exh. 508 (video clip). The video shows that Mr. Fassold told Ms. Snyder that "everything hurt," he had not had his medications for over 36 hours, and he had been throwing up blood. *Id.* Ms. Snyder

asked Mr. Fassold what medications he took and where he filled them. *Id.*[3] Mr. Fassold told Ms. Snyder that he took several medications, including Lamictal, which Ms. Snyder recognized as a seizure medication. *Id.*; dkt. 289 at 30:8-15.

Ms. Snyder asked Mr. Fassold if he had seizures, and he said that he did. Tr. Exh. 508. He told her that he had seizures earlier and showed her a bite inside his mouth indicating where he had bit his lip. Tr. Exh. 508; dkt. 289 at 11:5-7, 14:2-4. Ms. Synder looked inside his mouth and stated, "yea I see it." Tr. Exh. 508; dkt. 289 at 33:25–34:7. Mr. Fassold also showed her injuries to his knees from having seizures on the floor. Tr. Exh. 508. Mr. Fassold asked Ms. Snyder to go to the hospital and she stated that she would have to ask the medical provider. Dkt. 289 at 11:6-9. The correctional officer accompanying Ms. Snyder also responded that officers tried to take him earlier, but he refused. *Id.* at 12:10-16. Mr. Fassold stated, "I don't even remember that." Tr. Exh. 508.

Ms. Snyder did not call the on-call medical provider. Dkt. 289 at 14:5-9. Instead, she used the chat system to message her. *Id.* at 14:10-13. Her message stated,

> Fassold, Denim: Vital sign is blood pressure at 146 over 85. Heart rate is 71. O2 is 98. Temp is 97.5. No known drug allergies. Custody asked medical to evaluate patient for complaints of feeling very epileptic today. Patient stated that he has had a headache since yesterday and it won't go away. Patient also stated that he has been throwing up blood since yesterday, but no bloody emesis was observed. Patient stated he had a seizure earlier today and bit the inside of his mouth. Upon observation, the inside of the left cheek had been bitten, as well as the inside of the bottom lip. Custody stated that the provider

[3] The Estate of Fassold pointed out during trial that Ms. Snyder testified in her deposition that she asked Mr. Fassold about whether his family could bring in his medication, but the video footage does not show this interaction. Dkt. 289 at 7:14–11:4.

> was called this morning regarding this patient and they were ordered to send him to the ER. Patient refused to go to the ER and is now asking to be sent out.

Tr. Exh. 21-2. Ms. Snyder testified that she put "no bloody emesis was observed" because she did not see any blood on Mr. Fassold, but that she could not recall if she looked into his cell to see if there was any blood. Dkt. 289 at 24:5-19.[4]

Ms. Winings, the medical provider, responded by asking whether Mr. Fassold was taking medication. Tr. Exh. 21-2. Ms. Snyder responded that Mr. Fassold had "no medications currently." *Id.* Ms. Winings responded, "Fassold: Lamictal, 25 milligrams once a day. Tylenol, 1 gram twice a day for two days." *Id.* This was the last communication between Ms. Snyder and Ms. Winings concerning Mr. Fassold. Dkt. 289 at 44:19-21. Ms. Winings testified that she prescribed the low dose assuming that Mr. Fassold was starting the medication. Dkt. 285 at 25:6-11.

After Ms. Snyder received the medication order from Ms. Winings, she created a Medication Administration Record ordering Mr. Fassold to be administered Lamictal and Tylenol the following morning at 5:00 a.m. *Id.* at 44:22–46:8.

QCC's guidelines for caring for inmates with epilepsy state that in most cases it is not necessary to call 911 after a seizure. Tr. Exh. 23. Rather, 911 should be called "if the person has sustained an injury, has more than one seizure, or if they do not wake up after a seizure." *Id.*

---

[4] The Estate's counsel drew attention to the fact that Ms. Snyder testified in her deposition that she had observed the cell and not seen any blood. Dkt. 289 at 9:8-12.

**D. Ofc. Eldridge**

Officer Eldridge worked a twelve-hour shift in book-in during Mr. Fassold's second night in the Jail, from 8:00 p.m. on Sunday, July 9th to 8:00 a.m. on Monday, July 10. Dkt. 284 at 4:23–5:4 (Tr. Trans. Ofc. Eldridge Testimony). As the Book-in officer, she had to perform hourly security checks on Mr. Fassold. *Id.* at 37:16–38:12. She did not perform security checks at 9:00 p.m., midnight, 2:00 a.m., and 4:00 a.m. *Id.* at 38:4-12; Tr. Exh. 232 (Eldridge Employee File).

Ofc. Eldridge offered Mr. Fassold "meds" during the 5:00 a.m. medication pass on Monday, July 10, 2023. Dkt. 284 at 18:1-23; Tr. Exh. 509 (video clip). Ofc. Eldridge only had the Tylenol on hand when she offered Mr. Fassold the "meds." Dkt. 284 at 18:13–19:11. Ofc. Eldridge testified that she heard a "very, very faint 'huh-uh' sound," which she understood to be a refusal. *Id.* at 26:24–27:5. After asking Mr. Fassold another time, Ofc. Eldridge decided that Mr. Fassold was refusing his medication and marked it as a refusal. *Id.* at 26:20-24.

Ofc. Eldridge filled out a refusal to consent to medical treatment form, which stated that Mr. Fassold refused Tylenol and Lamictal. *Id.* at 25:2-4; Tr. Exh. 4. It also stated that "I" (Mr. Fassold) had been advised of the complications of "my" refusal, which could result in possible delay of medical treatment or death. Dkt. 284 at 29:2-12. Tr. Exh. 4. Ofc. Eldridge did not offer the refusal form to Mr. Fassold, nor did she advise him of the complications associated with refusal. Dkt. 284 at 28:19-23, 29:13-15. She also did not enter Mr. Fassold's cell. *Id.* at 31:23–32:3. Ofc. Eldridge had

received training instructing her that inmates should fill out and sign refusal forms. *Id.* at 31:15-20.

After another officer found Mr. Fassold unresponsive in his cell at around 7:10 a.m., Ofc. Eldridge responded to the officer's radio call and performed CPR on Mr. Fassold until another officer relieved her. *Id.* at 35: 11–36:4. Mr. Fassold was ultimately transferred to the emergency room, where he later passed away.

**E. Evidence Related to Damages**

The jury received instructions for awarding compensatory and punitive damages, to which the parties consented. *See* dkt. 239-3 (Final Jury Instructions). During closing arguments, Counsel for the Estate of Fassold asked the jury to consider Mr. Fassold's life expectancy and the fact that he could have lived another 44.8 years according to the life expectancy table presented into evidence. *See* Tr. Exh. 221 (Actuarial Table). The jury was also asked to consider the physical, mental, and emotional pain suffered by Mr. Fassold. The jury also heard testimony from Mr. Fassold's fiancé, Bethany Marell, about the quality of Mr. Fassold's life, including his role as a father to their two children, their future wedding, and his hobbies and lifestyle. Dkt. 290 at 8: 9–11:4; 14:2–20:12. Ms. Marrell also testified that Mr. Fassold did not work and that he was a daily marijuana and nicotine user who was not a healthy person. *Id.* at 8:9-17, 29:8–30:8. He took medications for epilepsy, bi-polar, anxiety, and depression, and, in addition to those conditions, he discussed his issues with high blood pressure, reflux, painful ulcers, and stomach problems, sleep disorders, and back pain. *Id.* at 30:14–36:24. Ms. Marrell witnessed Mr. Fassold vomit

nearly every day and have seizures hundreds of times. *Id.* at 36:4–38:24. She stated that he did forget to take his medications on occasion, including on the day he was arrested on July 8. *Id.* at 38:16–38:24. Ms. Marell did not witness Mr. Fassold "refuse" medical treatment, but when he was hospitalized for seizures, he would want to leave after feeling like himself again. *Id.* at 39:2-15. Ms. Marell testified that she had seen Mr. Fassold leave the hospital against medical advice. *Id.*

During closing arguments, Counsel for the Estate of Fassold asked the jury to award 50 million in compensatory damages in addition to punitive damages.

## III. The Estate's Motion for New Trial (dkt. 254)

The Estate of Fassold moves for a new trial on the limited issue of damages against Ms. Snyder, Ofc. Parsons, and Ofc. Eldridge pursuant to Federal Rule of Civil Procedure 59(a)(1)(A). Dkt. 254. Specifically, the Estate argues that there is no rational connection between evidence presented at trial and the jury's award of compensatory damages and its decision to not award punitive damages against Ofc. Parsons and Ofc. Eldridge. Dkt. 255. The Defendants argue that there is a rational basis between the jury's award and the evidence presented at trial because the jury could have found that circumstances outside of the Defendants' control contributed to Mr. Fassold's suffering and loss of life. Dkts. 259, 261. Moreover, the jury was not given much guidance on how to assess Mr. Fassold's life expectancy, and they were presented with evidence that he might not have lived the average lifespan. Dkt. 259.

Under Rule 59(a) a "new trial should be granted 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the

record, cries out to be overturned or shocks our conscience.'" *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017) (citation omitted). A court "will not set aside the jury's verdict if there is a reasonable basis in the record which supports that verdict." *Thomas v. United States*, 41 F.3d 1109, 1120 (7th Cir. 1994) (citation omitted).

A new trial can be limited to damages when liability and remedy present distinct issues. *Cobige v. City of Chicago, Ill.*, 651 F.3d. 780, 785 (7th Cir. 2011) (citing *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931)); *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (7th Cir. 2018) (remanding case for a new trial solely on the issue of damages because "[d]amages and liability present distinct issues"). A court views "'damages evidence in the light most favorable to the verdict,' and will permit the verdict to stand 'unless there [is] no rational connection between the evidence on damages and the verdict[.]'" *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1082 (7th Cir. 1998) (internal citations omitted).

**A. Compensatory Damages**

There is a rational connection between the jury's decision to award a total of $225,000 in compensatory damages and the evidence presented at trial. For one, the jury could have found that Ofc. Parson, Ofc. Eldridge, and Ms. Snyder's actions were not the sole cause of Mr. Fassold's pain and suffering or his loss of life. This is because evidence showed that Mr. Fassold had not taken his medication the day he was arrested. Furthermore, he did not tell anyone this until he told Ms. Snyder a day later, on July 9, that he had not had his medication for 36 hours.

Second, "the jury is entitled to disregard the amount of damages requested by a party, especially when evidence is introduced from which jurors could draw their own conclusions." *Carter*, 165 F.3d at 1082. Here, Ms. Marell's testimony provided evidence for not awarding the requested damages because she revealed that Mr. Fassold did not work and that he had many underlying health conditions that could limit his life expectancy and quality of life. In addition, aside from the actuarial table and Ms. Marell's testimony, the Estate of Fassold did not offer evidence supporting its request of 50 million dollars. Other courts have found that a jury's award of no damages or nominal damages is supported where the plaintiff provides "little, if any[,] evidentiary guidance on damages." *Culp v. Woods*, 2023 WL 4014181, at *3 (N.D. Ind. June 15, 2023) (quoting *Moore v. Hamilton Se. Sch. Dist.*, 2014 WL 12755906, at *4 (S.D. Ind. May 16, 2014)). Similarly, a jury's decision to award significantly less than the requested amount of compensatory damages is supported where the plaintiff did not provide much evidentiary guidance on damages.

The Estate of Fassold's reply argues that, in awarding damages, it would be improper for the jury to consider the totality of circumstances leading to Mr. Fassold's death after finding that the three Defendants had liability. *See* dkt. 267 at 2–7. Aside from citing the jury instruction, the Estate does not provide any evidentiary or legal support for this assertion. Insufficiently supported arguments are generally waived. *Schaefer v. Universal Scaffolding & Equip., LLC*, 830 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.") (citing *United States v. Hook*, 471 F.3d 766, 775

(7th Cir. 2006)); *see also White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[A]rguments raised for the first time in [a] reply brief are waived because they leave no chance to respond."). Furthermore, the jury instruction clearly allows jurors to consider the scope of the Defendants' actions in awarding damages. It states:

> If you find in favor of Plaintiff, the Estate of Denim Fassold, on one or more of Plaintiff's claims, then you must determine the amount of money that will fairly compensate Plaintiff for any injury that you find Denim Fassold sustained as a *direct result* of the failure to reasonably provide Denim Fassold with adequate medical care.

Dkt. 239-3 at 17 (emphasis added).

Accordingly, the Court finds that the jury's award of $225,000 in compensatory damages has a rational basis in the evidence presented at trial.

**B. Punitive Damages**

There is also a rational basis supporting the jury's decision to not award punitive damages. Punitive damages are available in § 1983 actions when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see also Alexander v. City of Milwaukee*, 474 F.3d 437, 453 (7th Cir. 2007) (affirming a jury's award of punitive damages where evidence permitted a jury to find that the defendants recklessly disregarded the plaintiff's rights by having notice that the police department had racist promotional policies that were changing the racial makeup of the department and failing to act to control it). Here, the jury instruction—to which Estate of Fassold does not object—stated:

> You may assess punitive damages only if you find that the individual Defendant's conduct was malicious or in reckless disregard of Denim Fassold's rights. Conduct is malicious if it is accompanied by ill will or spite, or is done for the purpose of injuring Denim Fassold. Conduct is in reckless disregard of Denim Fassold's rights if, under the circumstances, an individual Defendant simply did not care about Denim Fassold's rights.

Dkt. 239-3 at 18.

The Estate of Fassold claims that the juror interrogatories demonstrate that they found that Ofc. Parsons and Ofc. Eldridge failed to take reasonable action to provide medical care to Mr. Fassold by falsifying the medical refusal forms and incident reports. Dkt. 255 at 9–11. Thus, both officers evinced reckless disregard for Mr. Fassold's life. *Id.*

Nevertheless, even though the jury found that Ofc. Parsons and Ofc. Eldridge demonstrated *objective unreasonableness* in their responses to Mr. Fassold's medical needs by not complying with the requirements for assessing medical refusals, this finding does not necessitate a finding that they recklessly disregarded his rights. As the Custodial Defendants argue, the jury could have based its decision on evidence showing that Ofc. Parsons at least tried to take Mr. Fassold to the hospital and communicated with Ms. Snyder about his medical condition. This could show that, even though Ofc. Parsons was unreasonable, she did not completely disregard Mr. Fassold's rights. Moreover, the jury could have also determined that the officers' failure to follow proper procedure for handling refusals was motivated by self-preservation and carelessness, not necessarily a complete lack of care about Mr. Fassold's rights.

In sum, viewing the evidence on damages in the light most favorable to the Defendants, the Court finds that jury's award of $225,000 in compensatory damages and zero dollars in punitive damages has a rational connection to the evidence presented at trial. Therefore, the Estate of Fassold's motion for a new trial, dkt. [254], is **denied**.

## IV. Medical Defendant's Motion for Judgment as a Matter of Law (dkt. 252)

The Medical Defendant, Ms. Snyder, argues that she is entitled to judgment as a matter of law because the Estate of Fassold provided insufficient evidence that she violated Mr. Fassold's Fourth Amendment rights by failing to take action to provide medical care, that her actions were unreasonable, and that her actions harmed Mr. Fassold. Dkt. 253 at 3. Instead, the evidence demonstrated that Ms. Snyder provided reasonable medical care when she performed the medical assessment on July 9 and then conveyed the relevant information to the medical provider, Ms. Winings. *Id.* at 5–6. Ms. Snyder then relied on Ms. Winings's medical judgment to prescribe Tylenol and a low dose of Lamictal. *Id.* at 7. Last, there was insufficient evidence linking Ms. Snyder's actions to Mr. Fassold's death. *Id.*

Rule 50 provides that this Court may enter judgment as a matter of law if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis" to support the verdict. Fed. R. Civ. P. 50(a)(1), (b). The Rule 50 "standard largely 'mirrors' the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) [and 50(b)] motions in light of the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731–32 (2023) (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250–251 (1986)). Thus, in reviewing the motion for judgment as a matter of law, the Court draws all reasonable inferences in the Estate of Fassold's favor. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 674 (7th Cir. 2022). The Court does "not reweigh the evidence, assess the credibility of any trial witness, or otherwise attempt to usurp the jury's role as factfinder." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378 (7th Cir. 2020) (en banc). Thus, although the Court reviews the entire record, it "'must disregard all evidence favorable to the moving party that the jury [was] not required to believe.'" *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)). The Court must "must affirm the jury's verdict 'unless there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party.'" *Bohanon*, 46 F.4th at 675 (quoting *J.K.J*, 960 F.3d at 378 (7th Cir. 2020)).

As the Plaintiff correctly argues, the jury heard evidence providing it with a legally sufficient basis for its verdict against Ms. Snyder. *See* dkt. 263. First, there was ample evidence that Ms. Snyder unreasonably failed to take action to provide medical care for Mr. Fassold. After Ofc. Parsons told her about Mr. Fassold's medical issues at 8:00 a.m. on July 9, she waited until the end of her workday to see him. The delay meant that she could not reach Mr. Fassold's pharmacy to confirm his medications.

Furthermore, even though Ms. Snyder assessed Mr. Fassold's medical condition, a jury could conclude that her communication to the medical provider unreasonably omitted key information. During her medical assessment, she heard

and understood that Mr. Fassold had not taken his seizure medication, Lamictal, for 36 hours, was vomiting blood, and had had seizures which led him to bite his mouth and bruise his knees from falling on the floor. She also heard that he did not remember allegedly refusing to go to the hospital and that he still wanted to go due to his ongoing symptoms. Armed with this information, Ms. Snyder used the messaging system to contact the medical provider and gave a detailed—but incomplete—picture of Mr. Fassold's condition. Namely, she responded to the medical provider that he was not taking any medications. This led the medical provider to prescribe a low, entry-level dose of Lamictal. Also, the jury could have determined that the fact that the medical provider did not say anything about Mr. Fassold's refusal or request to go to the hospital warranted a follow up call or message from Ms. Snyder to get clarification. After all, she heard from Ofc. Parsons that the same medical provider ordered him to go to the hospital earlier that day for espousing the same symptoms.

A jury could have also concluded that Ms. Snyder's own inaction was unreasonable. The jury saw evidence that QCC's policies stated that an inmate should be transferred to the hospital if he suffered an injury from a seizure or had more than one seizure.

Last, a jury had sufficient evidence to determine that Ms. Snyder's actions harmed Mr. Fassold. The jury heard testimony from expert witnesses that if Mr. Fassold had been transported to the emergency room sooner, he could have survived. Although Ms. Snyder's conduct was not the only reason why Mr. Fassold was not

transported to the hospital, the jury heard evidence supporting an inference that she played a role in delaying his transfer, which ultimately harmed him. *See Ortiz v. City of Chicago*, 656 F.3d 523, 535 (7th Cir. 2011) ("Where an obviously ill detainee dies in custody and the defendants' failure to provide medical care is challenged, the causation inquiry is quite broad: 'the constitutional violation in question here is the failure to provide adequate medical care [ ] in response to a serious medical condition, not causing her death.'") (quoting *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010)) (modification in original).

In sum, viewing all evidence in favor of the Estate, the jury had a sufficient basis for finding that Ms. Snyder violated Mr. Fassold's Fourth Amendment rights. Thus, the Court **denies** Ms. Snyder's motion for judgment as a matter of law, dkt. [252].

## V. The Custodial Defendants' Renewed Motion for Judgment as a Matter of Law (dkt. 250)

The Rule 50(b) standard discussed in Part IV applies to Ofc. Parsons and Ofc. Eldridge's motion. The Custodial Defendants argue that they are entitled to judgment as a matter of law because the Estate of Fassold provided insufficient evidence that Ofc. Eldridge or Ofc. Parsons deprived Mr. Fassold of medical care and that they are entitled to qualified immunity. Dkt. 250. Regarding the sufficiency of the evidence, the Custodial Defendants argue that the jury's determination that Ofc. Eldridge missed security checks and did not follow Shelby County policy in reporting Mr. Fassold's refusals do not support Fourth Amendment liability because there is no evidence that Ofc. Eldridge knew Mr. Fassold needed medical care nor is there evidence that her actions harmed Mr. Fassold.

*Id.* at 9–14. Similarly, the jury's determination that Ofc. Parsons missed security checks, failed to follow Shelby County policy, and failed to follow-up with the medical provider do not support Fourth Amendment liability. *Id.* at 15–19.

The Estate of Fassold responds that the Custodial Defendants' Rule 50(b) motion goes beyond the scope of the grounds advanced in their Rule 50(a) motion for judgment as a matter of law and was forfeited. Dkt. 262. Moreover, Estate of Fassold argues that qualified immunity does not apply because Mr. Fassold's right to adequate medical care under the Fourth Amendment was clearly established when the events occurred in July 2023. The Court addresses each argument below.

**A. Sufficiency of the Evidence**

The Estate of Fassold first argues that the Custodial Defendants waived their sufficiency of the evidence argument because their Rule 50(a) motion was limited to qualified immunity and arguments regarding whether the Defendants reasonably relied on medical professionals when providing care to Mr. Fassold. Dkt. 262 at 2. The Custodial Defendants argue that their Rule 50(a) motion did advance a sufficiency of the evidence argument, and, in any case, the Estate had adequate notice of their arguments in pre-trial filings such as the Statement of Claims and Defenses, summary judgment briefings, and arguments on jury instructions throughout trial. Dkt. 266 at 4.

Federal Rule of Civil Procedure 50(a)(2) provides that a court can grant a motion for judgment as a matter of law made "any time before the case is submitted to the jury." Rule 50(a)(2) also requires the motion to "specify the judgment sought and the law and facts that entitle the movant to the judgment." *Id.* If the court denies

the motion, Rule 50(b) allows the movant to renew the motion after the jury returns its verdict. "'Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion.'" *Ziccarelli v. Dart*, 142 F.4th 477, 483 (7th Cir. 2025) (quoting *Thompson v. Memorial Hospital of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010)). The purpose of these rules is "to allow the responding party an opportunity to cure any defect in its case before it is submitted to the jury." *Laborers' Pension Fund v. A & C Environmental, Inc.*, 301 F.3d 768, 777 (7th Cir. 2002).

Whether a Rule 50(a) motion adequately specified the grounds for judgment is a fact-based inquiry that depends on trial context. *Ziccarelli*, 142 F.4th at 483. "Because Rule 50(a)'s specificity requirement serves a notice function, the question is whether the non-moving party should have understood the grounds that were raised by the Rule 50(a) motion. Such an assessment should encompass the broader trial context, including arguments made outside the four corners of a Rule 50(a) motion." *Id.* at 484. A party may rely on specific facts or arguments not expressed in a Rule 50(a) motion only when the non-moving party is clearly on notice of a more general argument in the same genre. *See, e.g.*, *Andy Mohr Truck Center, Inc. v. Volvo Trucks North America*, 869 F.3d 598, 605 (7th Cir. 2017) (affirming decision to consider Rule 50(b) motion when Rule 50(a) motion focused on lack of evidence to show unfair discrimination and Rule 50(b) motion attacked evidence as cherry-picked because "these all add up to the same thing").

Here, the Court finds that the Custodial Defendants' Rule 50(a) motion did not articulate their arguments about causation or broader Fourth Amendment liability beyond the contention that the Defendants were not liable because they relied on the judgment of medical professionals. Even still, the Estate of Fassold had notice of these arguments from two pre-trial filings. First, the Defendants motion for summary judgment argued that the record would not allow a reasonable jury to infer that any of the Custodial Defendants caused Mr. Fassold harm. Dkt. 81 at 19–20. Second, during pre-trial proceedings, the Custodial Defendants disputed the relevance of policy violations to Fourth Amendment liability in motions *in limine*. *See* dkt. 181 at 5 (Motions in Limine). Accordingly, the Estate of Fassold had notice of the grounds supporting the Custodial Defendants' motion before the close of evidence. In this way, the Custodial Defendants did not forfeit their arguments about causation and adherence to policy. See *Laborers' Pension Fund*, 301 F.3d at 777 (finding that grounds in a Rule 50(b) motion were not waived when they were argued in a motion for summary judgment and in motions in limine because the function of Rule 50 had been served) (citing *Urso v. United States*, 72 F.3d 59, 61 (7th Cir. 1995)).

Even still, the Court agrees with the Estate that the jury was presented with sufficient evidence to find Ofc. Parsons and Ofc. Eldridge liable for violating Mr. Fassold's Fourth Amendment rights.

**1. Ofc. Parsons**

The jury had sufficient evidence for finding that Ofc. Parsons violated Mr. Fassold's Fourth Amendment rights by failing to take reasonable measures to provide

medical care. First, Ofc. Parsons' testimony showed that she had notice that Mr. Fassold needed medical care because he complained about having seizures and vomiting blood, she saw something that looked like blood on his mouth, and the on-call provider told her to take Mr. Fassold to the hospital. Having viewed the video of Ofc. Parsons's attempt to take Mr. Fassold to the hospital, a jury could have found that Ofc. Parsons's decision to not take Mr. Fassold to the hospital was unreasonable especially since she testified that he was verbally nonresponsive. The Custodial Defendants argue that Ofc. Parsons only delayed medical care for three hours because she told Ms. Snyder about Mr. Fassold at 8:00 a.m. However, Custodial Defendants omit that the jury also heard that Ofc. Parsons told Ms. Snyder that Mr. Fassold refused to go to the hospital and that he signed a refusal form. Ofc. Parsons's communication to Ms. Snyder, therefore, did not necessarily put him under her immediate care. In this way, the jury had a sufficient basis for finding that Ofc. Parson violated Mr. Fassold's rights by unreasonably failing to follow the medical provider's order.

Moreover, even though Ofc. Parsons's failure to follow Shelby County procedures for checking on Mr. Fassold and documenting refusals does not, in itself, violate the Fourth Amendment, a jury could have determined that these actions demonstrated unreasonableness under the circumstances. *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) ("Section 1983 protects against constitutional violations, not violations of . . . departmental regulation and . . . practices[.]") (internal quotation omitted); *Thomas v. Dart*, 39 F.4th 835, 843 (7th Cir.

2022) (explaining that § 1983 claims "must be predicated on constitutional violations, not on violations of departmental regulations or practices"); *but see United States v. Brown*, 871 F.3d 532, 537–38 (7th Cir. 2017) (explaining that expert testimony regarding a department's policies and procedures can be relevant to the objective unreasonableness standard depending on the facts in the case and that widely used policy is more likely to be relevant than local policy). Indeed, the jury was instructed that policy can be relevant to determining whether an individual officer's actions were reasonable, but that the ultimate question is to "determine how a reasonable officer would act in the circumstances, not how an officer in a particular local jail would act." *See* dkt. 239-3 at 15. This is because, even though Ofc. Parsons had notice that Mr. Fassold needed medical help, she failed to check on him and failed to get a verbal refusal. A jury could have determined that a reasonable officer would have done these things before assuming that Mr. Fassold no longer needed to go to the hospital.

**2. Ofc. Eldridge**

The jury had a sufficient basis for finding Ofc. Eldridge liable for violating Mr. Fassold's Fourth Amendment rights. The Custodial Defendants first argue that Ofc. Eldridge did not have sufficient notice that Mr. Fassold required medical care. Though Ofc. Eldridge did testify that she was unaware that Mr. Fassold had seizures or needed medical help, the jury had a basis for disregarding this testimony. *See Passananti*, 689 F.3d at 659 (explaining that the court "'must disregard all evidence favorable to the moving party that the jury [was] not required to believe'") (citation omitted). For one, Mr. Fassold was in the medical observation cell, which could

indicate to a reasonable officer that he had a medical condition that needed close observation. Second, Ofc. Eldridge testified that she communicated with Ofc. Parsons to fill out Mr. Fassold's refusal form. A jury could have concluded that it was unbelievable that Ofc. Eldridge would communicate with Ofc. Parsons to get a signature regarding Mr. Fassold's refusal of medication, but not communicate with her about Mr. Fassold. Last, upon viewing the video of Ofc. Eldridge's attempt to give Mr. Fassold his medication, a jury could have concluded that very short, seconds-long, interaction demonstrated that she unreasonably failed to give Mr. Fassold an opportunity to refuse. If she had opened the cell or followed the directions of getting a refusal and explaining the ramifications of refusal, she could have seen that Mr. Fassold needed medical help. Again, her failure to abide by policy does not amount to a constitutional violation by itself. However, a jury had a sufficient basis for determining that Ofc. Eldridge's failure to check and failure to get an adequate refusal satisfied the objective unreasonableness standard.

The Custodial Defendants also argue that Ofc. Eldridge's actions did not cause Mr. Fassold harm because he was not having a seizure during any of the times that she was supposed to check on him. Dkt. 250 at 10. As the Estate points out, this argument imposes a heightened causation standard. As stated above, the jury was asked to determine whether Ofc. Eldridge's actions or inactions harmed Mr. Fassold, not whether they caused his death. *See Ortiz v. City of Chicago*, 656 F.3d 523, 535 (7th Cir. 2011). Moreover, the Custodial Defendants forget that around 4:46 a.m. on July 10, one of the timeframes where Ofc. Eldridge declined to check on Mr. Fassold,

he told someone in a neighboring cell that he had just had a seizure, and the neighbor reported the seizure to Master Control through the communications box audio.

**B. Qualified Immunity**

The Custodial Defendants' Rule 50(b) motion seeks judgment as a matter of law based on the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The defense provides 'ample room for mistaken judgments' and protects all but the 'plainly incompetent and those who knowingly violate the law.'" *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)). "A state official is protected by qualified immunity unless the plaintiff shows: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Kemp v. Liebel*, 877 F.3d 346, 350–51 (7th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Once qualified immunity is raised, the plaintiff, not the defendant, carries the burden of overcoming the affirmative defense. *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001) (citing *Spiegel v. Cortese*, 196 F. 3d 717 (7th Cir. 1999)).

To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *Reed v. Palmer*, 906 F.3d 540,

546–47 (7th Cir. 2018). "Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).

Qualified immunity "ordinarily should be decided by the court long before trial," *Hunter*, 502 U.S. at 228, "because '[t]he entitlement is an immunity from suit rather than a mere defense to liability,'" *id.* at 227 (quoting M*itchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see also Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006) ("Qualified immunity protects a defendant from liability as well as from the burden of standing trial. For that reason, courts should determine as early on in the proceedings as possible whether a defendant is entitled to qualified immunity."). However, there are occasions when a complete factual record is necessary. *See Emad v. Dodge Cnty.*, 71 F.4th 649, 654–55 (7th Cir. 2023) (concluding that summary judgment awarding qualified immunity to defendants was improper when the factual basis supporting the claims was unclear). When qualified immunity is asserted after trial, "the availability of official immunity should be determined by the trial record, not the pleadings nor the summary judgment record." *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) (internal quotations and citations omitted). "After trial, if defendants continue to urge qualified immunity, the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense." *Id.*

The Court's order granting in part and denying in part the Custodial Defendants' motion for summary judgment denied summary judgment for the

individual defendants on the basis of qualified immunity. Dkt. 210 at 29. Viewing *Estate of Perry v. Wenzel*, 872 F.3d 439, 459–60 (7th Cir. 2017) as a closely analogous case, the Court determined that there was a factual dispute as to whether the Custodial Defendants had reasonable notice that Mr. Fassold had serious medical needs and whether they took reasonable steps to provide access to medical care. *See* dkt. 240; dkt. 210.[5] This was because a jury could determine that Ofc. Eldridge and Ofc. Parsons' respective decisions that Mr. Fassold refused medical care on July 9 and 10 were reasonable given the circumstances. Thus, during pre-trial proceedings, the Court granted the Custodial Defendants' proposal to issue special juror interrogatories on the issue of qualified immunity so that the issue could be decided after trial. The Court ultimately rejected the Custodial Defendants' proposed interrogatories and provided its own interrogatory for the parties to review. Dkt. 240. The parties accepted the Court's proposed special juror interrogatory with modifications. Dkt. 237. As seen in Part I, the jury returned answers to these

[5] *Estate of Perry* held that jail officers were not entitled to qualified immunity on a decedent's Fourth Amendment claims because "by 2010, it was clearly established that an officer or prison nurse's actions were judged by the objectively reasonable standard of the Fourth Amendment, the failure to take any action in light of a serious medical need would violate that standard." 872 F.3d at 460. In *Estate of Perry*, the decedent was arrested and transported to a city jail. After he had a seizure in the holding cell, he was taken to the hospital by the city officers. The officers who took him expressed concern about his symptoms and consulted with the medical staff, who told them that his symptoms were from the medication. The hospital discharged him, and he was returned to booking before being transported to a county jail where a nurse could attend to him. While officers were transporting him, Perry's condition was deteriorating and officers had to carry him. Once at the jail, nurses attended to Perry, and noted that he was no longer breathing and did not have a pulse. A medical emergency was called, and county officers brought the resuscitation bag and Automated External Defibrillator to the nurses. Nevertheless, Perry died shortly thereafter. *Estate of Perry*, 872 F.3d at 446–59.

interrogatories for Ofc. Eldridge and Ofc. Parsons upon determining that they were liable for violating Mr. Fassold's Fourth Amendment rights. *See, infra*, Part I.

The Custodial Defendants argue that the juror interrogatories show that they did not violate clearly established law. Dkt. 250 at 21–22. For Ofc. Parsons, they argue that her improperly completed paperwork did not injure Mr. Fassold and was not a constitutional violation. *Id.* at 21. Furthermore, the fact that she did not immediately call the medical provider back after she determined that Mr. Fassold refused medical care was mitigated by the fact that she told Ms. Snyder about Mr. Fassold three hours later. *Id.* Similarly, Ofc. Eldridge's improperly completed paperwork and missed checks did not injure Mr. Fassold or amount to a constitutional violation. *Id.* at 22. The Estate of Fassold responds that, even though there is not a Seventh Circuit case with the exact same facts, *Estate of Perry v. Wenzel* clearly established that correctional officers must take action to provide reasonable medical care to arrestees experiencing serious medical issues, such as seizures, and that the record and the interrogatories show that the officers' actions were unreasonable. Dkt. 262 at 13–14.

Taking into account the trial record and the juror interrogatories, the Court agrees with the Estate of Fassold: the circumstances in this case made it so that Mr. Fassold's right to adequate medical care was clearly established and the Custodial Defendants disregarded this right by unreasonably determining that Mr. Fassold refused medical care, thus delaying and denying needed medical care. This unreasonableness is evidenced by the fact that both officers failed to check on Mr.

Fassold to determine whether he had an ongoing medical need. Furthermore, they did not obtain a verbal refusal or ensure that Mr. Fassold was actually refusing care by explaining the consequences of refusing medical care, and Ofc. Parsons did not follow the medical provider's instructions or follow up with her. The Custodial Defendants are correct that, taken in isolation, failure to fill out paperwork properly does not violate the Fourth Amendment. Nevertheless, given the totality of the circumstances, the record and interrogatories show that Ofc. Eldridge and Ofc. Parsons failed to take reasonable actions to provide Mr. Fassold with adequate medical care despite the fact that he was experiencing a serious medical condition that he complained about continuously. Similar to *Estate of Perry*, the officers took some steps to provide medical care—calling the medical provider and attempting to administer medication—but ultimately unreasonably concluded that no further action was needed after Mr. Fassold was nonresponsive. Qualified immunity does not apply.

## VI. The Estate's Motion for Attorney's Fees (dkt. 246)

The Estate of Fassold argues that her attorneys are entitled to attorney's fees under 42 U.S.C. § 1988. Section 1988 allows for the recovery of reasonable attorney's fees to a "prevailing party" other than the United States "in any action or proceeding to enforce" several civil rights statutes, including 42 U.S.C. § 1983. "A 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010). A party is a "prevailing party" if she "succeed[s] on any significant issue in

litigation which achieves some of the benefit the part[y] sought in bringing suit." *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (superseded in part by statute on other grounds)).

Here, there is no question that the Estate of Fassold is the prevailing party because the jury found against Ofc. Parsons, Ofc. Eldridge, and Ms. Snyder. Therefore, the Court must determine the appropriate amount of fees to award. To do so, courts typically apply the lodestar method to calculate reasonable fees, which is done by multiplying the attorney's reasonable hourly rate by the number of hours reasonably spent on the case. *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014). The lodestar approach applies even in cases where the attorney represents the prevailing party pursuant to a contingent fee, such as the instant case. *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011) (citing *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989)). The party seeking the fee award "bears the burden of proving the reasonableness of the hours worked and the hourly rates claimed." *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 550 (7th Cir. 1999) (citation omitted). District courts have a great deal of discretion in assessing the reasonableness of the hours expended by counsel. *See Gautreaux v. Chicago Hous. Auth.*, 491 F.3d 649, 659 (7th Cir. 2007). "Although the lodestar yields a presumptively reasonable fee, the court may nevertheless adjust the fee based on factors not included in the computation." *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014) (internal citations omitted).

The Estate of Fassold requests a lodestar amount of $1,105,243.75 with an enhancement multiplier of 2.0 based on the work of four attorneys. Dkt. 247 at 1. The Estate calculated the lodestar amount by multiplying each attorney's billed hours by their estimated rate. Mr. Shartzer billed 549.65 hours at $750.00 per hour, Mr. Cox billed 613.5 hours at $650.00 per hour, Mr. Potts billed 514.15 hours at $475.00 per hour, and Ms. Mize billed 107.2 hours at $475.00 per hour. *See* dkts. 247-1–247-4. The Estate also requests $64,143.67 in litigation-related expenses. *Id.* The Custodial Defendants and the Medical Defendant both responded that the Court should reduce the Estate of Fassold's lodestar calculation significantly and deny the enhancement. Dkts. 256, 260. Namely, the Defendants argue that counsels' hourly rates are not reasonable or supported by evidence, many of the time entries are unrecoverable because they are vague and duplicative, and the Court should reduce the overall amount to reflect the proportionality of the jury's award and Estate of Fassold's limited success on her claims. The Custodial Defendants also dispute the Estate of Fassold's attempt to recover undocumented costs as well as costs for expert witnesses and video conversion software. Dkt. 260 at 18–19.

As will be explained below, the Court **grants in part** the Estate of Fassold's motion for attorney's fees, dkt. [246], by modifying the amounts to which counsel is entitled. Specifically, the Court finds that the Estate of Fassold's counsel has not adequately supported their hourly rates. Furthermore, the Court uses its discretion to consider "the degree of success on the merits" and complexity of the case, ultimately reducing the lodestar amount by 40 percent. *See Montanez*, 755 F.3d at 556–57. The

Court **denies** Estate of Fassold's request for an enhancement. Last, the Court **orders** Estate of Fassold to file a proper motion for costs within 14 days of this order.

**A. Estate of Fassold's Hourly Rates**

To calculate the amount of reasonable fees incurred, the Court first must determine the reasonableness of the hourly rates sought by Estate of Fassold's counsel. "The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate." *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir.1996) (internal citation omitted). The fee applicant bears the burden of producing satisfactory evidence of her billing rate. *Pickett*, 664 F.3d 632, 640 (7th Cir. 2011). "If the court is unable to determine the attorney's true billing rate, however (because he maintains a contingent fee or public interest practice, for example), then the court should look to the next best evidence-the rate charged by lawyers in the community of 'reasonably comparable skill, experience, and reputation.'" *People Who Care*, 90 F.3d at 1310 (quoting *Blum v. Stenson*, 465 U.S. 892, 895 n.11 (1984)); *see Blum*, 465 U.S. at 886 ("[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."). "[O]nce the attorney provides evidence establishing his market rate, the burden shifts to the defendant to demonstrate why a lower rate should be awarded." *Spegon*, 175 F.3d at 554–55. If a fee applicant fails to satisfy her initial burden, the district court

may properly "make its own determination of a reasonable rate." *Pickett*, 664 F.3d at 640.

**1. Mr. Shartzer**

In support of his estimated hourly rate of $750.00 per hour Mr. Shartzer cites his twenty-two years of experience in "the practice of law" as well as two third party affidavits from Indiana lawyers familiar with Mr. Shartzer's work. *See* dkt. 247-1 ¶¶ 2, 9–10; dkt. 247-5, 247-6. Attorney John Cox affirmed that he offered Mr. Shartzer $900.00 an hour to work on a personal injury case, but Mr. Shartzer turned it down in favor of a contingency fee agreement. Dkt. 247-5 ¶¶ 4–7. Mr. Cox then stated that, in his professional opinion, $800.00 per hour represents "a fair market rate for Mr. Shartzer based upon his experience, reputation, demonstrated results and [his] personal first-hand experience of him turning down $900.00 per hour[.]" *Id.* ¶ 8. As the Custodial Defendants point out, however, this affidavit is of limited evidentiary value because Mr. Cox does not represent himself as familiar with the rates of civil rights attorneys, nor does he appear to practice civil rights law. Dkt. 260 at 7.

The second affidavit from Indiana Lawyer Brandon Tate bears slightly more weight because Mr. Tate has experience litigating civil rights lawsuits and he claims that he is familiar with the prevailing market rates for "attorneys with substantial experience in federal civil-rights litigation." Dkt. 247-6 ¶¶ 9, 11. Although, the significant civil jury verdicts listed by Mr. Tate involve personal injury and other tort claims. *Id.* ¶ 7. Mr. Tate attests that "[e]xperienced Section 1983 litigators with significant trial experience routinely command hourly rates in the $650-$900 plus

range, depending on experience, specialization, and case complexity." *Id.* ¶ 11. Therefore, based on Mr. Tate's knowledge of the subject matter and Mr. Shartzer's work, he believes that Mr. Shartzer's hourly rate of $750.00 is reasonable. *Id.* ¶ 14.

The Custodial Defendants urge the Court to disregard Mr. Tate's affidavit because Mr. Shartzer does not have "substantial experience" litigating § 1983 lawsuits. Dkt. 260 at 8; dkt. 260-1 (Westlaw Litigation Analytics Report showing Mr. Shartzer has litigated 3 civil rights cases and 3 prisoner rights cases since 2020).[6] Additionally, Mr. Tate's own rates do not conform to the range that he represented to the Court. As recently as May 2022, Mr. Tate represented to this Court that his estimated hourly rate as $475.00 per hour for a § 1983 lawsuit involving the wrongful death of a person who was shot by police. *See Robison v. Peterson et al.*, No. 1:19-cv-00589-RLY-MG, dkt. 171-1. Furthermore, the Custodial Defendants argue that Indiana lawyer Ken Falk, a renowned civil rights litigator with the ACLU of Indiana who has been practicing since 1977, had his hourly rate set at $600.00 per hour as recently as 2024 in *Blanchard v. Hyatte*, 3:21-cv-00160-CCBSJF (N.D. Ind. 2024) (ECF No. 130), which was an Eighth Amendment conditions-of-confinement case involving thirty incarcerated plaintiffs. Dkt. 260 at 8. Indeed, the Estate of Fassold's reply brief attaches an affidavit from Indiana lawyer Gavin Rose, who is a co-worker of Mr. Falk at the ACLU of Indiana, which states that Mr. Falk billed an hourly rate of $650.00 per hour in 2025. *See* dkt. 267-1. Mr. Rose, who has 19 years of legal experience and significant civil rights experience with the ACLU, billed a rate of

[6] The Estate of Fassold's reply brief lists seven recent civil rights cases since 2019, four of which are pending. *See* dkt. 268 at 11.

$550.00 per hour in 2025. *Id.* Another ACLU attorney, Ms. Pactor, who has practiced law since 2014 and specialized in civil rights since 2019, billed a rate of $450.00 per hour in 2025. *Id.* Mr. Rose represented that the ACLU "attempt[s] to set [its] hourly rates slightly below the rates that [it] would be able to charge" in a private law firm in Indianapolis, Indiana. *Id.* at ¶ 8.

Though Mr. Shartzer has vast experience as a successful litigator, he has not shown that he is an "experienced Section 1983 litigator" to warrant the rates described by Mr. Tate in this case. Moreover, Mr. Tate does not identify his own rates or any cases where the rates he describes were awarded or actually paid by clients. Thus, Mr. Tate's opinion is not evidence of "the rate that lawyers of similar ability and experience in their community normally charge their paying clients for the type of work in question." *Spegon*, 175 F.3d at 555*; see, c.f., Harper v. City of Chicago Heights*, 223 F.3d 593 (7th Cir. 2000) ("While an attorney's self-serving affidavit alone cannot establish the market rate for that attorney's services, such affidavit in conjunction with other evidence of the rates charged by comparable lawyers is sufficient to satisfy the plaintiff's burden."). Additionally, as the Defendants point out, it is incredulous that civil rights litigators with much more relevant civil rights experience would bill hundreds of dollars less per hour, even if they are intentionally setting their rates lower than the private market. *See* dkt. 268-1. Nevertheless, the Custodial Defendants also do not support their argument that Mr. Shartzer's estimated rate should be $400.00 per hour. *See* dkt. 260 at 7–8.

Therefore, given the evidence in the record, the Court determines that a reasonable rate for Mr. Shartzer is $550.00 per hour. The Court came to this conclusion by referencing the rate billed by Mr. Rose, an experienced civil rights attorney who has been practicing for 19 years, roughly the same time as Mr. Shartzer. This rate represents the fact that Mr. Shartzer, who has considerably less civil rights litigation experience than Mr. Rose, would bill at a market rate while Mr. Rose bills slightly lower than market.

**2. Mr. Cox**

In support of his estimated hourly rate of $650.00 per hour, Mr. Cox cites his 19 years of experience in complex and class action litigation, a considerable jury verdict in a § 1983 lawsuit, Mr. Tate's affidavit, and this Court's decision to award attorneys' fees at the same rate in a class action lawsuit, *see* dkt. 247-2 ¶ 4, (citing *Outzen v. Kapsch et al.*, 1:20-cv-01286-TWP-MJD, Dkt. #324 at ¶¶ 33 and 34 (S.D. Ind. June 24, 2022)).

The Custodial Defendants argue that Mr. Cox's evidence presents the same issues as Mr. Shartzer's. The Court agrees. Although Mr. Cox's fee award in *Outzen* is extrinsic evidence of his actual rates, the award does not necessarily apply in this case because *Outzen* was a complex class action. Not only does Mr. Cox specialize in complex class action litigation, but these types of cases tend to demand more per hour than single plaintiff lawsuits. Nevertheless, the Custodial Defendants also do not support showing that Mr. Cox should only bill $275.00 per hour.

Thus, based on the evidence in the record, the Court determines that a reasonable rate for Mr. Cox is $550.00 per hour. As explained above, this rate tracks what civil rights attorney Mr. Rose bills. Mr. Rose has roughly the same years of experience as Mr. Cox in the legal profession, but considerably more civil rights experience. Yet, Mr. Rose intentionally bills under-market rates because he works at the ACLU.

**3. Mr. Potts**

In support of his hourly rate of $475.00, Mr. Potts cites his fifteen years of experience in criminal law and the flat fee he charges for his criminal cases, dkt. 247-4 ¶ 9. This is unacceptable. *See Spegon*, 175 F.3d at 556 ("An attorney's self-serving affidavit alone cannot satisfy the plaintiff's burden of establishing the market rate for that attorney's services."). For one, Mr. Potts does not state that he has any civil rights or § 1983 experience, nor does he cite evidence that any of his criminal law clients have actually paid the amounts that he charges. Mr. Potts cites cases where he has been retained as an attorney in criminal matters, but this does not provide any information about the market rate for his services in a civil rights case.

Given the evidence in the record, the Court will award a rate of $225.00 per hour. This represents half of the rate billed by ACLU lawyer Ms. Pactor, *see* dkt. 268-1. It is reasonable to assume that Mr. Potts would receive half of Ms. Pactor's billable rate because, though he has practiced for the same amount of time as Ms. Pactor, he has no documented civil rights experience at all.

**4. Ms. Mize**

In support of her estimated hourly rate of $475.00, Ms. Mize cites her twenty-four years of experience as an attorney as well as her "customary hourly billing rate." Dkt. 247-3 ¶ 5. The Estate of Fassold's reply clarifies that Ms. Mize has appeared in the same seven civil rights lawsuits as Mr. Shartzer since 2019, four of which are pending. Dkt. 268 at 11. Ms. Mize does not provide any information about her role in those lawsuits. Thus, Ms. Mize has not met her burden of showing that her estimated rate is reasonable for the same reasons as Mr. Potts. She provides absolutely no evidence of her actual billing rate or of the attorneys' fees granted to similar situated attorneys in similar cases. Furthermore, the Court will not assume, without concrete evidence, that Ms. Mize has the same civil rights or trial litigation experience as Mr. Shartzer just because she works at the same law firm.

Without more information, the Court will award the $350.00 per hour, which is one hundred dollars more per hour than Mr. Potts. This rate reflects the fact that Ms. Mize has some civil rights experience based on her appearances in seven lawsuits and has been a lawyer for twenty-four years.

**B. The Estate of Fassold's Billed Hours**

The Estate's attorneys billed a total of 1,784.5 hours collectively. *See* dkts. 247-1–247-4. The Custodial Defendants responded that many of counsel's time entries are unrecoverable because they are vague, duplicative, and excessive. Dkt. 260.

The Estate of Fassold has the burden of proving the reasonableness of billed hours. *Spegon*, 175 F.3d at 550 (citing *Hensley*, 461 U.S. 424 at 433). "[T]he district court has an obligation to 'exclude from this initial fee calculation hours that were

not 'reasonably expended' on the litigation." *Id.* (quoting *Hensley*, 461 U.S. at 434). In making this determination, the Court considers whether the prevailing party used "billing judgment." *Id.* at 552. In exercising "billing judgment," "counsel for the prevailing plaintiff should 'exclude from a fee request hours that are excessive, redundant, or *otherwise unnecessary*, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.'" *Id.* (quoting *Hensley*, 461 U.S. at 434) (emphasis in original); *see Montanez*, 755 F.3d at 555–56 (affirming a district court's decision to reduce hours when it determined that the case was over-litigated and two partners spent time doing the same thing); *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1160 (7th Cir. 1989) ("While we have refused to lay down a flat rule of one lawyer per case, the tendency of law firms to overstaff a case should cause the trial court to scrutinize a fee petition carefully for duplicative time.") (internal citations omitted). In addition, the Court may deduct improperly or inadequately recorded hours. *Montanez*, 755 F.3d at 555; *see also Hensley*, 461 U.S. at 437 n.12 (an attorney "is not required to record in great detail how each minute of his time was expended," but the attorney "at least . . . should identify the general subject matter of his time expenditure").

**1. Vague and Unintelligible Entries**

The Custodial Defendants' initially objected to Mr. Shartzer's illegible handwritten entries and asked the Court to reduce the entries by 80%. Dkt. 260 at 13. The Estate of Fassold's reply attached a typed version of Mr. Shartzer's time entries to which the Custodial Defendants filed a surreply. *See* dkts. 268-2, 297. The

Custodial Defendants' surreply pinpoints several entries as overly vague and urges the Court to disregard all of Mr. Shartzer's entries. Dkt. 297 at 2–3. Upon reviewing the entries, the Court finds that the majority are sufficiently descriptive in that they identify the subject matter of the time expenditure. *See Hensley*, 461 U.S. at 437 n.12. For example, the Custodial Defendants contest an entry stating "[r]eview video and take time stamp rules." Dkt. 268-2 at 2. But this description obviously refers to the time it took for Mr. Shartzer to watch the video footage and match it with the appropriate time stamps. Moreover, Mr. Shartzer's entries regarding video review are not overly vague even though they do not specify exactly which portion of the video he viewed. It can be inferred that Mr. Shartzer viewed what was produced to him, 80 continuous hours of video from two different camera systems, and his review included an attempt to mark the time. *See* dkt. 247 at 20. "Although 'block billing' does not provide the best possible description of attorneys' fees, it is not a prohibited practice." *Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 569 (7th Cir. 2006). When reviewing block-billed entries, the court must consider whether the entries are "sufficiently detailed to permit adequate review of the time billed to specific tasks" and whether that time was reasonably necessary. *Cintas Corp. v. Perry*, 517 F.3d 459, 469 (7th Cir. 2008). Here, the Court's familiarity with the video record makes it so that the block-billed entries regarding video review are reviewable and not vague.

Nevertheless, the Court finds the following entries to be overly vague and reduces them from the calculation. These entries are inadequate due to undefined abbreviations that the Court could not decipher from the context of the entry. *See*

*Hensley*, 461 U.S. at 437 (the fee applicant "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims."). Other entries are inadequate because they are so general that the Court cannot discern the subject matter.

- 8/14/23 "R & A–ltr from attorney general." .1 hours.
- 8/14/23 "R & A-ltr from Shelby Co. Com Corrections." .1 hours.
- 2/27/24, "Attend TPTC," .25 hours.
- 9/12/24, "Review Ct. order," .1 hours.
- All the entries from page 37 to page 40. These entries just state, for example, "Call w/ potts" or "T.C. OPC FBT." Because they are produced out of chronological order, the Court cannot decipher the subject matter or reasons for the calls. *See Soleau v. Ill. Dep't of Transp*., 2011 WL 2415008, at *8 (N.D. Ill. June 9, 2011) ("Each entry should be considered in context of the surrounding entries.").

Therefore, the Court deducts **20.85 hours** from Mr. Shartzer's entries because they are vague and inadequate.

**2. Duplicative and Excessive Entries**

The Custodial Defendants argue that Estate of Fassold's entries across all four attorneys are excessive and duplicative. Dkt. 260 at 13–14; dkt. 297 at 4. The Estate of Fassold argues that the number of issues, pre-trial motions, and complex nature of the case warranted the amount of time billed by all four attorneys.

The Court agrees that the amount of time billed to review the video and audio footage is excessive and duplicative. Mr. Shartzer billed 143 hours for reviewing video and audio footage. Dkt. 268-1 at 2–4. Mr. Cox billed 80 hours. Dkt. 247-2 at 5. Mr. Potts billed 104.2 hours related to video and audio review. Dkt. 247-4 at 1–2.[7] Although it is reasonable that more than one attorney would view the video footage firsthand, it is unreasonable that *three* attorneys (billing at their normal rates) would watch the entirety of the footage, plus more in Mr. Potts and Mr. Shartzer's case. Once one person figured out the time-stamping and viewed the entirety of the footage to pick out the relevant parts, the Court does not see a reason why the other attorneys should duplicate this effort much less bill it to a client.[8] Moreover, having reviewed the uncut and un-timestamped video footage, the Court does not see how Mr. Shartzer could plausibly bill 143 hours, which is almost twice the total video footage of 80 hours. Although it is understandable that Mr. Shartzer would have to view the entire 80 hours and then spend some time going back to figure out the timing, it is inconceivable that it would take him 63 hours to do this when most of the video covers time where nothing relevant to this lawsuit occurred. Furthermore, as the Defendants point out, the videos themselves only cover 40 hours of actual time since the videos represent two views of the same time period. Therefore, the Court strikes 50 hours from Mr. Cox, Mr. Potts, and Mr. Shartzer's respective time entries. The

---

[7] These entries reflect time spent viewing the videos at the beginning of the case, not during the pre-trial phase. Pre-trial preparation is addressed below.

[8] As an example of the duplicative effort, both Mr. Potts and Mr. Shartzer had billing narratives related to time-stamping the videos. *See* dkt. 268-2 at 2–4; dkt. 247-4 at 1–2.

Court notes that if counsel had not used block-billing to record these entries, the Court may have been able to decipher non-duplicative efforts.

Mr. Cox and Mr. Potts's time entries for attending the individual Defendants' depositions that Mr. Shartzer took are duplicative, especially when both attorneys also billed for reviewing the depositions. *See, e.g.*, dkt. 247-2 at 6 (Cox entry for "[r]eviewed depositions and document productions[.]" and "[c]ontinued reviewing depositions"); dkt. 247-4 at 4 (Potts entry for "deposition transcript review of individual defendants.") Moreover, Mr. Potts's entry for attending the Rule 30(b)(6) deposition, which Mr. Cox took, is duplicative and excessive. Therefore, the Court deducts Mr. Cox's 14 hours for attending the individual defendants' depositions and Mr. Potts's 36 hours for attending the individual depositions and the 30(b)(6) deposition.

The Court also deducts Mr. Potts and Ms. Mize's entries for time spent at trial. Even if multiple attorneys are staffed on a case, there is seldom reason for every attorney who has touched a case to attend the entirety of a trial, much less the time that it takes the jury to deliberate. *See Purnell v. Long Electric Co.*, No. 1-22-cv-02426-SEB-MJD, dkt. 124 at 13–15 (striking time spent at trial for associates who did not participate in the trial).[9] At trial, Ms. Mize did not take any witnesses, make opening statements or closing arguments, or respond to any motions. Although there

[9] The Estate of Fassold argues that Ms. Mize and Mr. Potts's time entries for attending trial are reasonable because the Custodial Defendants had all three attorneys who appeared in the case attend trial. Dkt. 268 at 5–6. In addition to being irrelevant, this is not reflected in the record. The Custodial Defendants had two attorneys attend trial as well as paralegals, which presumably bill at a much lower rate.

is no doubt true that "efficiency can sometimes be increased through collaboration," the Seventh Circuit has observed that "overstaffing cases inefficiently is common and district courts are therefore encouraged to scrutinize fee petitions for duplicative billing when multiple lawyers seek fees." *Schlacher v. Law Offices of Phillip J. Rotche & Assocs.*, P.C., 574 F.3d 852, 858 (7th Cir. 2009). The Court will also strike Mr. Potts's entries for attending the trial on the days that he did not participate as well as the time he billed on November 6 not related to his examination of Ms. Marell. Though some of Mr. Potts's block-billed entries from trial days include trial preparation with Ms. Marell as opposed to trial attendance, he also billed a significant amount of hours related to meeting with Ms. Marell in the days leading up to the trial. Thus, the Court deducts 74.5 hours from Mr. Potts and 37.3 hours from Ms. Mize.

The Custodial Defendants dispute the amount of time each attorney billed to wait for the jury verdict on November 7 and November 10. Dkt. 260 at 13–14. Mr. Shartzer billed 7 hours on November 7 and 7.5 hours on November 10 to account for waiting for the verdict. Dkt. 268-2 at 35. Mr. Cox billed 16.5 hours for the entirety of November 7 and 6 hours on November 10. Dkt. 246-2 at 9. The amount of time billed by two attorneys to wait for the verdict strikes the Court as unreasonable. *See Cherrone v. Snyder*, 2021 WL 4355387, at *5 (S.D. Ind. Sept. 24, 2021) (cutting the amount of time billed to wait for the verdict in half because 21 hours over two days was excessive even when the plaintiff's attorneys had to arrive before the jury due to the plaintiff's incarceration) (citing *Warfield v. City of Chi.*, 733 F.Supp.2d 950, 959–

60 (N.D. Ill. 2010)). Thus, the Court will deduct 10 hours from Mr. Shartzer and Mr. Cox's entries respectively.

The Custodial Defendants also dispute the amount of time each attorney billed for pre-trial preparation. The Estate of Fassold responded that the Custodial Defendants did not pinpoint any specific entries, and the nature and complexity of the case necessitated the hours billed.

Without more detailed objections, the Court cannot determine that the Estate of Fassold's billing for trial preparation is excessive or duplicative. The Court will, however, deduct time that the Estate of Fassold spent time-stamping the videos and cutting them up to create exhibits in the days leading up to trial. As can be seen from the pre-trial orders, the Estate of Fassold presented duplicative, unacceptable, and unidentifiable videos as exhibits and then had to redo their exhibits because they did not follow the Court's directions. *See* dkts. 213, 227. On top of this, Mr. Shartzer, Mr. Cox, and Mr. Potts each have extensive pre-trial time entries related to preparing exhibits and time-stamping the videos. It is unfathomable that *three* attorneys would have to bill for the same activity related to exhibits on the eve of trial. Thus, these entries are both unreasonable and duplicative. Therefore, the Court deducts 25.5 hours from Mr. Shartzer, *see* dkt. 268-2 at 33, 30.2 hours from Mr. Cox, *see* dkt. 247-2 at 4; and 4.9 hours from Mr. Potts, *see* dkt. 247-4 at 7.

In sum, the Court has deducted **106.35** hours from Mr. Shartzer's entries; **104.2** hours from Mr. Cox's entries; **165.4** hours from Mr. Potts's entries; and **37.3** hours from Ms. Mize's entries.

**C. Enhancement of Lodestar Amount**

The Estate of Fassold seeks a two times enhancement of the lodestar based on the risk its counsel took by agreeing to a contingency fee arrangement and its exceptional success in a complicated case. Dkt. 247 at 20.

Contingency enhancements above the lodestar figure are appropriate only in "'cases of exceptional success.'" *Evans v. Evanston*, 941 F.2d 473, 478 (7th Cir. 1991) (quoting *Hensley*, 461 U.S. at 435). The Supreme Court has consistently said that lodestar enhancements "may be awarded in "'rare' and 'exceptional' circumstances." *Perdue*, 559 U.S. at 552 (citations omitted). Moreover, "the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors presumably [are] fully reflected in the number of billable hours recorded by counsel." *Id.* (quotation marks and citations omitted).

Here, the Estate of Fassold was successful in securing a verdict against Ofc. Parsons, Ofc. Eldridge, and Ms. Snyder. But they were unsuccessful in most of their claims. *See Evans v. City of Evanston*, 941 F.2d 473, 478 (7th Cir. 1991) (affirming the district court's denial of a lodestar enhancement where plaintiff lost one of two claims).

Furthermore, the Supreme Court has concluded that enhancement to the lodestar for contingency fee arrangements is prohibited in other fee-shifting statutes. *See City of Burlington v. Dague*, 505 U.S. 557, 566–67 (1992). This has been applied to prohibit contingency fee enhancements in § 1983 lawsuits. *See Perdue*, 559 U.S. at 558 (explaining that a district court deciding a motion for fees under § 1988 erred in

granting an enhancement based on the risk of contingency contravened *Dague*). Accordingly, the Court **denies** the Estate of Fassold's request to enhance the lodestar amount by two times.

**D. Adjustment of Lodestar Amount**

The Custodial Defendants and Medical Defendant argue that the Court should reduce the overall lodestar amount to reflect the Estate of Fassold's limited success on her claims. Dkts. 256, 260. The Court agrees. Namely, Estate of Fassold began this lawsuit by bringing state law, Fourth Amendment, Americans with Disabilities Act ("ADA"), and Rehabilitation Act claims against 16 Defendants. Dkt. 1-1. The Court granted summary judgment to the Defendants on the ADA and Rehabilitation Act claims and on the Fourth Amendment claims against Shelby County Sheriff's Office and 5 individual Defendants. Dkt. 210. The parties stipulated to the dismissal of the state law claims. Dkt. 197. Therefore, the case proceeded to trial exclusively on Fourth Amendment claims against 7 Defendants, only 3 of which were found liable. Moreover, as seen above, the jury returned a verdict granting a small percentage of the requested compensatory damages and no punitive damages. Because *Estate of Fassold* achieved "only partial or limited success" in this case, a fee reduction is appropriate. *Hensley*, 461 U.S. at 434.

"Although the lodestar yields a presumptively reasonable fee, the court may nevertheless adjust the fee based on factors not included in the computation." *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014) (internal citations omitted). For example, the district court may consider "the degree of success on the merits,

especially 'where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief.'" *Id.* (quoting *Hensley*, 461 U.S. at 434). "Where the hours spent on successful claims can easily be distinguished from those spent on unsuccessful claims, the court can simply strike the latter entries when computing the lodestar." *Id.* However, "when the work on each set of claims is difficult to disentangle, the lodestar calculation will likely include some time spent on unsuccessful claims, and in these cases the court ought to reduce the lodestar figure." *Id.* "Ultimately, the guiding inquiry is whether 'the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.'" *Id.* (quoting *Hensley*, 461 U.S. at 424). Importantly, as Estate of Fassold points out, the level of success is not directly pegged to the amount that she recovered in damages. Nevertheless, it is a factor in measuring the degree of success according to the factors laid out in *Hensley*. *See Spegon*, 175 F.3d at 558 ("[A]lthough the fee award need not be proportionate to the amount of damages a plaintiff actually recovers, it is a factor that a court should consider when contemplating a reduction of the modified lodestar amount.").

Here, the Court cannot deduce what amount of time was spent on successful versus unsuccessful claims. Therefore, **the Court reduces the lodestar by 50%.** This number reflects the degree of success as well as the complexity of the case. First, the Court declines to adopt the Defendants request to reduce the lodestar by directly calculating successful versus unsuccessful claims. This kind of math would unfairly ignore that the Estate of Fassold's work on unsuccessful claims, such as the *Monell*

claim against Shelby County Sheriff's Office, likely informed their successful claims against the three individual Defendants at trial. *See Jaffee v. Redmond*, 142 F.3d 409, 413 (7th Cir. 1998) ("*Hensley* makes clear that when claims are interrelated, as is often the case in civil rights litigation, time spent pursuing an unsuccessful claim may be compensable if it also contributed to the success of other claims.") Nevertheless, a significant reduction is warranted because the Defendants were successful in defeating the vast majority of the Estate of Fassold's claims, including more than half of the claims at trial. Moreover, the reduction reflects that Estate of Fassold only secured a small portion of the requested damages. Last, although this case required labor to obtain and review the video footage, it did not present any new issues of law or especially complex facts. The Estate of Fassold also contributed in part to the labor-intensiveness of this case during pre-trial proceedings by not following the Court's instructions and not working with the other parties to resolve issues, such as jury instructions, verdicts, and creating a joint exhibit list.

Therefore, although "[n]o algorithm is available' for adjusting a lodestar to reflect partial or limited success," a 50% reduction strikes the Court as necessary to account for the above-mentioned factors. *Montanez*, 755 F.3d at 557 (affirming 50% reduction in lodestar where plaintiff lost four out of six claims and achieved a small portion of the requested damages); *see also Thomas v. Shoshone Trucking, LLC*, 2023 WL 2649490, at *1–13 (S.D. Ind. Mar. 27, 2023) (reducing lodestar by 40% to reflect limited success on claims at trial and a small portion of the requested damages); *World Outreach Conference Center v. City of Chicago*, 896 F.3d 779, 784 (7th Cir.

2018) (affirming seventy percent fee reduction); *Spegon*, 175 F.3d at 558–59 (affirming fifty percent fee reduction).

**E. Costs**

Regarding costs, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). Rule 54(d) creates "a strong presumption that the prevailing party will recover costs, with the ultimate decision resting within the district court's discretion." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 945 (7th Cir. 1997). "The presumption in favor of awarding costs to the prevailing party is difficult to overcome, and the district court's discretion is narrowly defined—the court must award costs unless it states good reasons for denying them." *Id.* The list of recoverable costs authorized pursuant to 28 U.S.C. § 1920 include:

1. Fees of the clerk and marshal;
2. Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
3. Fees and disbursements for printing and witnesses;
4. Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
5. Docket fees; and
6. Compensation of court appointed experts.

28 U.S.C. § 1920.

Here, the Estate of Fassold seeks $64,143.67 in costs. Dkt. 247 at 1. The Custodial Defendants object to the Estate's attempt to recover costs for expert fees, for the Rule 30(b)(6) deposition, and the payment to a media company to convert the video footage and make clips for use at trial. *See* dkt. 260 at 18–19.

Before reaching the merits of the Custodial Defendants' objections, the Court notes that it cannot evaluate Estate of Fassold's bill of costs because it is essentially laid out over three different affidavits and unsupported by any documentary evidence of actual expenditures. *See Soler v. Waite*, 989 F.2d 251, 255 (7th Cir. 1993) (explaining that the party seeking costs has the burden to demonstrate that items on its Bill of Costs are "allowable and, if so . . . are both reasonable and necessary"). This is an issue because, as seen above, a prevailing party can only recover the costs authorized by 28 U.S.C. § 1920. So, for example, parking fees do not appear in the statute, but they appear in Mr. Cox's affidavit. *See* dkt. 247-2 at 9. Mr. Potts just requests $116.00 in costs without explaining what is included in this figure. Dkt. 247-4 at 7. This is unacceptable.

Thus, the Estate of Fassold is **ordered** to supplement its request for costs by filing a single document laying out the requested costs authorized by § 1920 within 14 days of this Order. This document shall be supported by appropriate evidence of expenditures. To ensure proper documentation, the Estate of Fassold is encouraged to use the AO form 133 as stated in Local Rule 54-1 for the Southern District of Indiana. The Defendants may file any objections within 14 days. Given the strong

presumption in favor of awarding costs, the parties are encouraged to come to an agreement before submitting any objections.

### F. Conclusion

In sum, the Court has determined that the lodestar amount shall encompass the following. Mr. Shartzer is credited for **443.3** hours at $550 per hour; Mr. Cox is credited for **509.3** hours at $550.00 per hour; Mr. Potts is credited for **348.75** hours at $250 per hour; and Ms. Mize is credited for **69.9** hours at $350 per hour. This is a total of $635,582.50.

Using its discretion the Court reduced the lodestar amount by 50%. Therefore, the total recoverable amount of attorney's fees pursuant to § 1988 are: **$317,791.25**.

The Estate of Fassold may refile a proper motion for costs as described above **within 14 days of this Order**.

## IV. Conclusion

The Court **VACATES** its Order denying the Custodial Defendants' motion for judgment as a matter of law without prejudice, dkt. [274]. The **clerk is directed to remove** the motion flags associated with the renewed motion for judgment as a matter of law, dkt. [295].

The Estate of Fassold's motion for a new trial, dkt. [254], is **DENIED.** The Medical Defendant's motion for judgment as a matter of law, dkt. [252], is **DENIED**. The Custodial Defendants' motion for judgment as a matter of law, dkt. [250], is

**DENIED**. the Court **GRANTS IN PART** Estate of Fassold's motion for attorney's fees, dkt. [246], as described above.

**IT IS SO ORDERED.**

Date: 09/30/2026

JAMES R. SWEENEY II, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution:

All ECF-Registered Attorneys of Record